**AFFIRMED; Opinion Filed November 19, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-00681-CR

**VICTOR ALMENDAREZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from Criminal District Court No. 7**
**Dallas County, Texas**
**Trial Court Cause No. F15-76304-Y**

# MEMORANDUM OPINION
Before Justices Lang, Fillmore, and Schenck
Opinion by Justice Lang

Following a plea of not guilty, appellant Victor Almendarez was convicted by a jury of injury to a child. Punishment was assessed by the jury at fifteen years' imprisonment.

In two issues on appeal, appellant contends the evidence was legally insufficient to support his conviction and he received ineffective assistance of counsel in the trial court. We decide appellant's two issues against him. The trial court's judgment is affirmed.

## I. FACTUAL AND PROCEDURAL CONTEXT

The indictment in this case alleged that on approximately September 12, 2015, appellant "intentionally and knowingly cause[d] serious bodily injury" to his son, V.A., a child under fourteen years of age, "by STRIKING [V.A.] WITH AND AGAINST AN UNKNOWN OBJECT,

THE EXACT NATURE AND DESCRIPTION OF WHICH IS UNKNOWN." (emphasis original). During opening statements at trial, counsel for appellant stated in part,

> Evidence will be presented to you that on the night [of September 11] young [V.A.] was ill, coughing, up all night, keeping his mother up that night, vomiting, unhealthy. She was taking care of the child most of the night. We will show that [appellant], a loving caring father got mostly a full night's sleep, but the mother did not. . . . Then she got up at approximately 5:00 or 5:30 in the morning, washed the children and got them ready to go, and the baby, little [V.A.], was still sick, still had a problem.
>      [Appellant] got up about 7:30 or so. . . . Now, ladies and gentlemen, [appellant] wasn't dealing with the child between 5:00 o'clock [sic] in the morning and 7:30, and that's critical . . . because evidence will be presented to you that the child received the injuries sometime within 5 hours prior to being admitted to the hospital, which was at 11:00 o'clock that morning.
>
> . . . .
>
> You'll know for absolutely certain that there's one liar in this courtroom by the time you're done. It is the mother of this child and that is critical because she was the one that was tired. She was the one that was agitated.

Dr. Craig Huang testified at trial that he works in the emergency department at Children's Medical Center Dallas. He stated he was on duty there on September 12, 2015. At approximately 11:30 a.m., eight-month-old V.A. was brought into the emergency department by his father and aunt. According to Huang, V.A. was "really unresponsive" and was having "abnormal muscle movements" called "posturing," which indicate "the brain is not working correctly" and can occur during a seizure. Huang stated that the history that was provided to him was that "[V.A.] had been sick the day before, I believe with some vomiting, but that seemed to have resolved kind of by the early morning and the child had been able to tolerate something by mouth" and "[t]hen . . . later in the morning the father noticed that the child wasn't really acting right or breathing right."

Huang testified a CT scan showed "intracranial bleeding inside the head," which is "very serious." Also, Huang saw "[s]ort of a redness, maybe a bruise" on V.A.'s upper eyelids. Huang stated it became apparent to him that V.A.'s condition was caused by "some traumatic event." Huang testified that because V.A.'s history did not show a "trauma mechanism of any kind," his condition was considered "non-accidental trauma" and Huang was required to notify "CPS" and a

"child abuse pediatrician" from "the REACH Clinic."[1] The child abuse pediatrician notified by Huang was Kristin Reeder. After several hours of treatment in the emergency department, V.A. was transferred to the hospital's Trauma Intensive Care Unit.

On cross-examination, Huang testified that "besides what was around the eyes," he did not initially see any bruising or "signs of rough handling" on V.A. He later saw "a small bruise on the inside of the ear." There were no other "obvious external signs of injury." Further, Huang testified (1) he was told V.A. had a "history of asthma" and "received Albuterol at home," (2) Albuterol is a medication used for asthma or wheezing and is administered through a nebulizer or inhaler, and (3) he "heard" that the mother's initial version of her activities during that morning "ended up not being true."

Additionally, on redirect examination, Huang testified in part as follows:

Q. Does [Albuterol treatment] cause bleeding in the brain?

A. No.

Q. . . . The bleeding in the brain that's going on took a traumatic event, didn't it?

A. Yes.

Q. And I would imagine that basically you're [sic] training and experience, that such a traumatic event would be something that would have altered the state pretty fast. The symptoms would have been pretty immediate; is that fair to say?

A. Yes.

Q. We have no history whatsoever of any sort of posturing or seizing activity before . . . 9:00 or 9:30 that morning; is that right?

A. Correct.

On re-cross-examination, Huang testified (1) it is "almost impossible to precisely pinpoint the time of [V.A.'s] injury"; (2) based on V.A.'s "immediate presentation," Huang "suspected"

---

[1] The record shows "CPS" is the Texas Department of Family and Protective Services and "REACH" is an acronym that stands for "referral and evaluation of at-risk children."

that his injury took place within the last "twelve to twenty-four" hours; (3) it is "certainly possible" that if V.A. was "injured acutely," "the symptoms wouldn't all immediately present" and "sometimes take a little while to onset"; and (4) it is "entirely possible" that V.A. "was injured as early as sometime in the middle of the night and only started showing his symptoms once [appellant] started taking care of him sometime around 9:30." Additionally, on further redirect examination, Huang testified it is "fair to say" that "if hypothetically you're told that the baby is in a normal state of health until 9:00 o'clock [sic], that might be a pretty big clue that that traumatic event had not yet happened."

Carolina Madrigal testified through an interpreter that she is married to the brother of V.A.'s mother, Lorena Velasquez, and thus is an aunt of V.A. On September 11, 2015, she took care of V.A. during the day while his parents worked. She stated V.A. was "well," was not sick, and did not throw up while he was with her. Appellant picked up V.A. at about 5:00 p.m. Madrigal testified that at approximately 8:00 p.m., "Lorena called me and asked me what had I given the baby to eat that day because he had vomited."

Further, Madrigal stated she received a call from Velasquez the following day at approximately 11:00 a.m. At that time, Velasquez asked Madrigal to "do her a favor and go check on the baby" because "[t]he child was sick with [appellant]." Madrigal's husband drove her to appellant's home, which was close by. She stated appellant answered the door and told her V.A. was in his crib in the bedroom. When Madrigal went into the bedroom, V.A. "was lying down in the crib and his eyes were like gone and his body was limp." Madrigal told appellant it was necessary to take V.A. to the hospital and he agreed. Madrigal held V.A. in her arms while appellant drove them to the hospital. She stated she "went in running" and carried V.A. to the hospital's reception area. According to Madrigal, at that point, V.A. "stretched out" and "stiffened."

–4–

On cross-examination, Madrigal testified (1) prior to the time V.A. "stiffened" in the hospital reception area, he "wasn't having a seizure and nothing like that was happening" and (2) while at the hospital, she gave a written statement to police in which she stated in part that when she arrived at appellant's home, appellant was the only adult at the house and "the little boy was in the crib lying on his back and he could not breathe and his body was like limp."

Velasquez testified through an interpreter that she has been married to appellant since 2013 and he is the father of her two youngest children, V.A. and a three-year-old daughter. Additionally, Velasquez has a nine-year-old son, J.F., who lives with her and appellant. Velasquez stated V.A. suffers from asthma and was briefly hospitalized for respiratory problems several months prior to the incident in question. His "regular doctor" prescribed an inhaler, which they used at home on occasions "when he could not breathe."

Velasquez stated that on September 11, 2015, she arrived home from work at approximately 6:00 p.m. She stated she "saw the baby vomit once" that evening and gave him some "rice water" afterward. According to Velasquez, V.A.'s eyes did not appear "out of the ordinary" or "different than usual." Further, Velasquez testified (1) during V.A.'s bath that evening, he "play[ed] with the water" as usual and she did not see "any bruises on his body" or "anything out of the ordinary"; (2) V.A. went to sleep in his crib that night at approximately 9:30 p.m. and slept until approximately 7:00 a.m. the next day, which is typical for him; (3) V.A. was not up all night crying and she does not recall telling anyone that; (4) V.A.'s crib is located in the same bedroom where she and appellant sleep; (5) she woke up at approximately 6:00 a.m. on September 12, 2015; (6) on awakening, she looked at V.A. and "saw that everything was okay, that he was normal"; and (7) she gave V.A. "rice water" that morning and he kept it down.

At approximately 8:25 a.m. on the date in question, Velasquez placed V.A. into his car seat and appellant drove Velasquez and the three children to a Fiesta supermarket. According to

Velasquez, V.A. appeared "normal like always." Velasquez entered the store alone, bought breakfast food for the family and "Pedialyte" for V.A., and returned to the car. At that point, she said goodbye to the children because her boss was picking her up at Fiesta to take her to her housecleaning job. She stated V.A. "was buckled up in his carrier and he was playing."

Velasquez testified she does not have access to her phone while she is working. During a work break shortly after 11:00 a.m., she checked her phone and saw missed calls from appellant at 11:03, 11:04, and 11:06. She testified she called appellant and he told her the baby "is sick" and "turning like purple." She stated she told appellant to call 9-1-1, but he did not do so. Approximately two minutes later, she called Madrigal, asked her to "go check on" V.A., and told her she would meet her at the hospital. Then, Velasquez asked a friend to drive her to the hospital. When Velasquez arrived at the hospital, CPS was there and began questioning her. She testified she lied and told CPS she was running errands that morning because "I was afraid to tell them I was working." She stated she told CPS the truth later that day. Further, Velasquez stated (1) she learned at the hospital that V.A. "had lots of injuries to his brain" and "doctors immediately knew this was not an accident"; (2) she did not purposely or accidentally cause V.A.'s injuries; (3) V.A. remained hospitalized for a month and now requires a feeding tube and has "lots of seizures"; and (4) V.A. is currently living in a foster home while she completes training on how to meet his special medical needs.

On cross-examination, Velasquez testified (1) when she arrived home on the evening of September 11, 2015, appellant told her V.A. "had been vomiting heavily"; (2) V.A. was not coughing that evening and she did not give him any breathing treatments; (3) she and appellant went to bed at approximately 11:00 that evening and were not awakened by V.A. during the night; (4) appellant awoke at approximately 7:30 a.m. the next day; (5) she does not remember whether she told CPS and police that during her phone call to appellant from work, appellant told her the

baby had turned purple and she told him to call 9-1-1; and (5) in her written statement to police on the date in question, she stated only that appellant told her during the phone call that V.A. was not breathing properly.

J.F. testified through an interpreter that on the morning in question, appellant drove the family to a Fiesta supermarket near their home. J.F. stated that in the car, V.A. seemed "okay" and "happy." After Velasquez went to work, appellant drove to a nearby church and dropped off J.F. at a catechism class. J. F. stated V.A. was "doing okay then." On cross-examination, J.F. stated his mother and appellant both seemed "happy" that morning and no one in his family was tired or sick.

Dr. Bruno Braga testified he is a pediatric neurosurgeon at Children's Medical Center Dallas. He treated V.A. on September 13, 2015. Braga stated V.A.'s CT scan showed "subdural hematoma," which is "a blood clot underneath the outer membrane of the brain." Further, Braga testified V.A. had "two kinds of clots": (1) "more acute," i.e., "new," and (2) "more chronic," i.e., "older." According to Braga, "[b]ecause we saw that, we have to investigate why this patient would have two different events or two different lesions." He ordered an MRI, which showed more lesions "inside the brain itself and all over the brain, like on the right side, on the left side and in the front, in the back, close to the surface and deep into the brain." Braga stated (1) that indicated to him that V.A. had suffered a "very significant injury" involving "significant force"; (2) "when you see [subdural bleeding] all over the brain, front and back, deep and superficial and right and left, it's usually from like an inflicted injury"; (3) based on his experience, if there is no "report of a significant trauma" in such circumstances, then "usually . . . there was an inflicted injury that someone is just not telling"; (4) "[t]his is a non-accidental injury"; (5) "breathing issues" such as V.A. experienced do not cause subdural hematoma; (6) "any significant injury to the brain that leads the person to a coma and raises the pressure in the brain can lead to breathing difficulties";

and (7) V.A. also had "some injury to the ligaments of the spine," which is "consistent with . . . some sort of violent action." Additionally, Braga stated,

Q. . . . [T]he traumatic event that happened, would you have expected to see some sort of an acute change in the baby?

A. Yes.

Q. In other words, the baby would go from being in a normal state to a not normal state around the time of whatever the traumatic event was that caused this; is that fair to say?

A. That's fair to say, yes.

Q. Okay. Let's talk about the history that is given. . . . The father said child is in the normal state of health until about 9:00, 9:30. Let's stop right there.
        You're hearing so far that the baby had slept through the night, woke up in the usual state, was playful. You're hearing from the father that the baby is in a normal state of health. Now, based on what you're hearing, had the traumatic event happened yet?

A. No, not yet.

Q. Not yet.

A. The acute traumatic event, no.

Q. 9:00, 9:30, now he goes limp. Would you call that an acute change?

A. Yes, I would.

Q. And so we have then when he's checked on almost an hour later in the crib, short breaths, eyes rolling back. That's part of the acute change you were talking about?

A. Yes, it is.

Further, Braga testified V.A.'s injuries were life threatening and his prognosis respecting V.A. is "poor" because V.A.'s brain development was impaired. According to Braga, "it's fair to say that we don't expect the baby to have a normal development."

On cross-examination, Braga stated (1) an "acute" injury is one that happened within the past fourteen days and a "chronic" injury is one that occurred more than fourteen days ago; (2) V.A.'s CT scan showed both acute and chronic injuries; (3) Braga did not notice any bruising

or external injuries when he examined V.A.; (4) he cannot tell from his examination the exact date or time V.A.'s injuries took place; (5) based on the MRI, the acute injury "probably . . . happened within maybe three days"; and (6) his "assumptions about when this took place or how it took place" could change "if the histories change." Additionally, Braga testified,

Q. And when these children have the trauma that causes the injuries, what would be—from the layman's point of view, what would be the immediate symptoms that they start seeing?

A. So vomiting, seizures or an acute change in their behavior. So if they are playing, then they would stop playing. If they eat, they would stop eating. If they, you know, are calm, they would be irritable and crying.

. . . .

Q. And you do admit that even minor traumas can cause death and cause significant subdural hematomas; correct?

A. Correct. . . . Just one note. So subdural hematoma can be caused by simple falls, but the lesions that we saw on the MRI, in my opinion, cannot be caused by simple fall.

Q. Simple falls.

A. Yes, or from a short height.

. . . .

Q. And it's entirely possible, for instance, that this child could have had traumatic trauma at 6:00 o'clock in the morning and he wouldn't show significant signs of these kinds of symptoms until 9:00 or 10:00 o'clock in the morning; correct?

A. Correct. But that doesn't seem to be what the history says.

Q. Okay. But that is possible, is it not?

A. If the history is not accurate, yes, it is possible.

. . . .

Q. . . . Is it possible that the child had been injured previously and then a parent saw the injuries a little later on and started seeing symptoms of a previously caused injury?

A. That is possible if we did not have the history that the baby was normal in that morning. But we do see significant injuries in the MRI. The baby could not have been normal.
    So with the significant injuries in the MRI, we have to assume that the event was after— was sometime after the baby was normal.

Further, on redirect examination, Braga testified,

Q. You just told this jury that after the traumatic event that caused this, you expect a continued decline; is that right?

A. Yes, that's right.

Q. They're not going to have something happen, then get better. . . . .

A. That's right.

. . . .

Q. Did you get any sort of a history that the baby was up all night crying, kicking, screaming and keeping everybody up all night long?

A. No.

Q. He was normal up until that 9:00, 9:30 period; right?

A. Yes.

. . . .

Q. . . . [D]id you get any history of a short fall?

A. No, we did not.

. . . .

Q. But basically, your opinion, this is not from a short fall?

A. No, it's not.

Tra-my Dinh testified she is a physician assistant at MD Kids Center, a primary care facility. She stated that on September 3, 2015, she saw V.A. during his "follow-up visit" for bronchiolitis, which is "a viral infection of the lungs that usually occurs in small infants and small toddlers." Dinh stated V.A. was "still having significant cough," so she "added on" an inhaled steroid medication called Tamacort "to kind of help control his cough." According to Dinh, V.A. otherwise appeared to be in "a normal state of health" and "a normal mental state" and she did not see any bruising on him.

Dinh testified that prior to that visit, V.A. had been treated multiple times for episodes of wheezing and bronchiolitis and was diagnosed with "reactive airway disease," which is "a term that we often use when we're not sure of a diagnosis of asthma." As part of that treatment, V.A. was prescribed Albuterol, which is "common."

–10–

Fidel Perez testified he is a detective with the Dallas Police Child Abuse Unit and was assigned to investigate the injury in question. On September 12, 2015, he went to Children's Medical Center Dallas and interviewed medical personnel and witnesses. He spoke separately with appellant and Velasquez. According to Perez, appellant initially told him (1) after going to the store, the entire family, including Velasquez, returned home; (2) a short time later, Velasquez left and "was gone for about 15 minutes when the baby became sick"; and (3) at that point, appellant called Velasquez on the phone to notify her. Further, Perez testified Velasquez told him (1) "everybody had got up in the morning and went to the store as a family," (2) her family returned home and she remained at the store, and (3) "after a while, that's when the Defendant had called her." Perez stated neither appellant nor Velasquez gave him any sort of explanation for the injury in question or said anything about V.A. being awake or crying during the previous night.

Perez testified that on September 15, 2015, both appellant and Velasquez were interviewed by police again at the Dallas Children's Advocacy Center. At that time, appellant told police his initial statement was not true and stated (1) after Velasquez left for work on the date in question, he dropped off J.F. at church and returned home with the other two children, and (2) he and the two youngest children had been at home for a short time when the baby became sick. Perez stated appellant (1) told him the baby was "fine" and "in normal health" until "the symptoms occurred," at which time appellant called the child's mother; (2) denied causing V.A.'s injuries; and (3) did not describe any "falls of any type" or "any sort of traumatic event" that could have explained those injuries. Perez stated that at that point, he "started looking at [appellant] as a suspect" based on "the information we'd received from . . . the doctor, specifically that when this event occurred to the child, . . . [h]e would have been sick fairly quickly" and "with that information we knew that [appellant] was going to be the adult with the child when this happened." Specifically, Perez testified in part,

Q. So essentially what you have here is everybody saying that the baby was in a normal state of health up until he was alone with the Defendant?

A. Correct.

Following that interview, Perez obtained a warrant for appellant's arrest.

Dr. Kristin Reeder testified she is an assistant professor of pediatrics at UT Southwestern Medical School and an attending physician in the REACH Clinic at Children's Medical Center. She was contacted by medical personnel during the treatment of V.A. on the date in question because there was a "suspicion of some sort of physical abuse." She stated her evaluation of V.A. showed several injuries, including head trauma, neck injury, bruising to both eyes, a bruise "within his ear," and "a couple of scratch marks or bruises" on his chin and neck. According to Reeder, (1) V.A.'s CT scan showed "significant devastating head trauma," which "is not the trauma that we talk about, you know, bouncing your baby on your knee or tossing your baby up in the air and playing with him," but rather is seen in cases involving "things like high-speed motor vehicle collisions where the child is not appropriately restrained, boating accidents, those types of things"; (2) "most of" V.A.'s brain tissue has been irreversibly damaged; (3) the "type of mechanism" that would cause this type of injury is "a shaking or whiplash type mechanism" and "there was likely a slamming component as well"; (4) looking at the acute bleeding "in a vacuum per se, with absolutely no history whatever," she "would think it would happen in the last 24 hours"; (5) the symptoms would have been "immediate"; and (6) "[t]he baby would not have been acting normally after this type of injury." Additionally, Reeder testified as follows:

Q. So now if the history is the child is fine, playful—the father said the child was in normal state of health until 9:00 or 9:30, and now he goes limp. Would it be your opinion that this is around the time that this traumatic event took place?

A. Yes.

. . . .

Q. Would you agree that—you know, I told you that there had been reports that the baby had thrown up the night before?

A. Yes.

Q. Now, would you agree with this statement, that with this type of traumatic event that happened to the baby, babies don't just have this happen, get better, have symptoms, get better? It doesn't happen like that, does it?

A. It does not.

On cross-examination, Reeder stated in part,

Q. Is it entire [sic] possible that symptoms that were demonstrated by the child at the time of the injury would not be as severe as they were when you saw them; correct?

A. Not likely.

Q. So initially, the symptoms that would be observed by a non-scientist and a non-doctor might be things like being drowsy or things like having respiratory problems; correct?

A. Not in a child with this extensive of a brain injury. There would be more severe symptoms.

. . . .

Q. And based on the science, it is entirely possible that the initial symptoms could have been mild and then gotten worse over time. That's rational; right?

A. No, sir, not with the extent of this injury.

Additionally, Reeder testified on cross-examination (1) if she had only the CT scan and MRI imaging upon which to base a conclusion, she "could not rule out" the possibility that V.A.'s injury "could have taken place between 6:30 and 7:00 o'clock in the morning"; (2) at least one study described in a published medical journal concluded that "even after having a severe head injury where there's subdural hematoma, that there might be times where the child can act normally" for "as much as 5 minutes to 48 hours after the injury"; and (3) she "disagrees" with the outcome of that study because the methods used were "not accurately depicted."

On redirect examination, Reeder testified (1) babies who "roll off beds" do not "end up with this type of brain damage" and (2) it is her opinion that "the symptoms that would be

–13–

displayed" at the time this type of injury occurred "would be something that the average person could tell."

During closing argument, the prosecution stated in part,

And both sides had an opportunity to make an opening statement and told you what they thought the evidence was going to show, what they expected the evidence to show and made you some promises about what you were going to hear.
The Defense got up there and made you the promise that you're going to hear about a baby that was so sick that it kept the mother up all night long, throwing up all night long, was sick and coughing all night long.
That's what the Defense told you you were going to hear, but what you heard from the witness stand and what you heard from the evidence and what you saw from the medical records and from what other family members reports is that was flat out not true.
. . . .
That morning was normal. That baby was normal that morning. That's what you heard. The Defense promised you something different.

Additionally, during final summation after the defense's closing argument, the prosecution stated in part,

The promise he made to you in opening statement, "You will hear that this baby was up all night crying, screaming, and she had to get up all night."
You didn't hear a shred of that and the reason you didn't get a shred of that is because it did not happen. Baby slept through the night just like normal.

The defense stated in part during closing argument, "[T]his is what you need to pay attention to. When [Velasquez] starts talking, she doesn't tell the truth."

Following the jury's conviction of appellant and the assessment of punishment described above, appellant filed a motion for new trial, which was overruled by operation of law. This appeal timely followed.

## II. SUFFICIENCY OF THE EVIDENCE

### *A. Standard of Review*

When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Zuniga v. State*, 551

S.W.3d 729, 732 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard requires the appellate court to defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*.; *see also Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007) ("inference" is conclusion reached by considering other facts and deducing logical consequence from them). "We may not re-weigh the evidence or substitute our judgment for that of the fact-finder." *Zuniga*, 551 S.W.3d at 732. Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *Id*. at 733. We presume the fact-finder resolved any conflicting inferences from the evidence in favor of the verdict and we defer to that resolution. *Id*.; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In analyzing legal sufficiency, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778. Further, "[d]irect evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Zuniga*, 551 S.W.3d at 733.

### B. Applicable Law

Texas Penal Code section 22.04 provides in part that a person commits the offense of injury to a child if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes serious bodily injury to a person fourteen years of age or younger. TEX. PENAL CODE ANN. § 22.04(a) (West Supp. 2017). "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death,

serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id*. § 1.07(a)(46).

### C. Application of Law to Facts

In his first issue, appellant contends his conviction "was based on evidence of a legally insufficient nature and quality." Specifically, according to appellant, "testimony from the State's own witnesses actually showed that it was just as likely that [V.A.] had been injured while in the sole care of Appellant's wife and had not manifested the symptoms of those injuries until Appellant was serving as the sole adult care giver." In support of that assertion, appellant cites the testimony of Huang, Braga, and Reeder described above. Additionally, appellant argues,

> [T]he law recognizes that the failure to maintain a consistent story is—as a matter of law—some of these [sic] strongest evidence for concluding that a witness is not telling the truth. . . . Unlike his wife, Appellant never tried to provide any type of alibi for himself. If a failure to maintain a consistent story accrues to establish the lack of a person's credibility, then Appellant's having maintained a consistent story regarding his whereabouts increased the evidence of his credibility. Accordingly, the State's evidence, at the very most, supports nothing more than a suspicion or mere probability of Appellant's guilt.

(citations to authority omitted).

As described above, by all accounts, V.A. was in the sole care of appellant starting at approximately 9 a.m. on the date in question. Additionally, the record shows (1) Velasquez and J.F. testified V.A. was normal, happy, and playing immediately prior to being placed in appellant's care; (2) Perez testified appellant told him the baby was "fine" and "in normal health" until "the symptoms occurred," at which time appellant called Velasquez; (3) Huang testified in part that it is "fair to say" that "if hypothetically you're told that the baby is in a normal state of health until 9:00 o'clock [sic], that might be a pretty big clue that that traumatic event had not yet happened"; (4) Braga testified in part that V.A. suffered a "very significant injury" involving "significant force" and "with the significant injuries in the MRI, we have to assume that the event was after— was sometime after the baby was normal"; and (5) Reeder testified in part that V.A.'s symptoms

–16–

"would have been immediate" and "with this type of traumatic event that happened to the baby, babies don't just have this happen, get better, have symptoms, get better." Further, regardless of the alleged consistency of appellant's "story regarding his whereabouts" or the alleged inconsistency of Velasquez's account of her whereabouts, it is "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *See Zuniga*, 551 S.W.3d at 732. On this record, viewing all the evidence in the light most favorable to the verdict, we conclude a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

We decide against appellant on his first issue.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

#### *A. Applicable Law*

To prevail on a claim of ineffective assistance of counsel, an appellant "must demonstrate two things: deficient performance and prejudice." *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). An appellant has the burden to establish both prongs by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). "An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *see also Strickland*, 466 U.S. at 697.

Under *Strickland*'s first prong, an appellant must prove deficient performance by showing that his counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687–88. An objective standard of reasonableness is defined by prevailing professional norms and there is a strong presumption that counsel's performance conformed to those norms. *Id.* at 689. To overcome the presumption, an appellant must rely on evidence of counsel's deficiency affirmatively demonstrated in the record. *Lopez v. State*, 343 S.W.3d 137, 142-43 (Tex. Crim. App.

2011). We review counsel's performance by considering the totality of the circumstances as they existed at the time of trial, without the benefit of hindsight and without relying only on isolated circumstances at trial. *See Ex parte Flores*, 387 S.W.3d 626, 633–34 (Tex. Crim. App. 2012). Ordinarily, this Court will not find an attorney ineffective in the absence of a record of his rationale if there is any plausible strategic reason for his action or inaction. *Villa v. State*, 417 S.W.3d 455, 463 (Tex. Crim. App. 2013).

As to *Strickland*'s second prong, the "ultimate focus" of the *Strickland* prejudice standard is "the fundamental fairness of the proceeding whose result is being challenged." *Miller*, 548 S.W.3d at 499 (citing *Strickland*, 466 U.S. at 694). This requires the reviewing court to examine "the totality of the evidence before the judge or jury." *Id*. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. "If the deficient performance might have affected a guilty verdict, 'the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Miller*, 548 S.W.3d at 499 (quoting *Strickland*, 466 U.S. at 695).

### B. Application of Law to Facts

In his second issue, appellant contends the trial court's judgment must be reversed based on ineffective assistance of appellant's trial counsel. Specifically, appellant asserts,

> Appellant's trial counsel—as shown by his failure even to try to confront Appellant's wife with any prior inconsistent statement—had no admissible evidence that Appellant's infant son had been up all night. Accordingly, no reasonably competent criminal law advocate would have told the jurors in opening statement that those jurors would hear such non-existent evidence and thereby open the door for the State to give the jurors not only reasons to doubt the defense team's credibility, but also reasons for doubt that had come straight from the defense team itself.

–18–

. . . .

> . . . As shown above, the State was able to provide the jurors with grounds—straight from Appellant's trial counsel's mouth—for doubting the credibility of the defense team, such that Appellant's trial counsel's deficient performance was clearly prejudicial to Appellant's legal rights and interests.
>
> Clearly, confidence in the outcome reached is at least undermined because in a circumstantial evidence case where the State's team of experts could not state who had injured Appellant's infant son or establish when such injuries had been inflicted, Appellant's trial counsel failed to function as counsel by providing the jurors with grounds for doubting the credibility and trustworthiness of the defense team.

The State responds (1) "the record is utterly silent regarding trial counsel's reasoning regarding his statements and thus do [sic] not support a claim that the statements were deficient" and (2) appellant "has not shown that the statement was harmful." Specifically, as to the first prong of *Strickland*, the State argues "it is possible" that "during his conversations with Appellant, trial counsel was informed that the baby had been up the entire night before" and trial counsel anticipated appellant would testify on his own behalf, but appellant "changed his mind about whether he wished to testify as the trial unfolded." Further, as to the second *Strickland* prong, the State asserts (1) "[w]hile the State may have pointed out the lack of evidence in the record supporting the statement during closing argument, that did not prevent trial counsel from arguing that Ms. Velasquez was just as likely as Appellant to have injured V.A.—his primary defense"; (2) "[t]rial counsel also argued to the jury that Ms. Velasquez's testimony regarding the weeks prior to V.A.'s arrival at the hospital were not credible because she changed her story three times with investigators"; and (3) "the weight of the evidence may have persuaded the jury against trial counsel's argument—even if V.A. had been up the night before."

The record does not show appellant's ineffective assistance of counsel complaint was asserted in the trial court or that trial counsel made any explanation on the record respecting the complained-of actions and inactions. Further, the State's appellate argument set out above describes a plausible reason for trial counsel's actions and inactions. *See Strickland*, 466 U.S. at

691 (reasonableness of counsel's actions may be determined or substantially influenced by defendant's own statements or actions and therefore inquiry into counsel's conversations with defendant may be critical to proper assessment of counsel's litigation decisions). Ordinarily, this Court will not find an attorney ineffective in the absence of a record of his rationale if there is any plausible strategic reason for his action or inaction. *See Villa*, 417 S.W.3d at 463; *see also Flores*, 387 S.W.3d at 633–34 (we review counsel's performance by considering totality of circumstances as they existed at trial, without benefit of hindsight and without relying only on isolated circumstances at trial). On this record, we conclude appellant has not shown a deficiency affirmatively demonstrated in the record and thus has not overcome the presumption that his trial counsel's performance conformed to prevailing professional norms. *See Lopez*, 343 S.W.3d at 142–43 (to overcome presumption, appellant must rely on evidence of counsel's deficiency affirmatively demonstrated in record). Therefore, the first prong of *Strickland* has not been satisfied. *See Strickland*, 466 U.S. at 687.

Moreover, as to prejudice, the record shows (1) appellant's trial counsel argued to the jury multiple times that Velasquez was not credible and (2) multiple expert witnesses testified as to a probable sequence of events that put V.A. in appellant's sole care at the time of his injury. On this record, we conclude appellant has not met his burden to show there is a reasonable probability that, but for trial counsel's alleged unprofessional errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694; *see also Miller*, 548 S.W.3d at 499 (determination of prejudice under *Strickland* requires court to examine totality of evidence before judge or jury). Therefore, the second prong of *Strickland* has not been satisfied. *See Strickland*, 466 U.S. at 694.

We decide against appellant on his second issue.

## IV. CONCLUSION

We decide appellant's two issues against him. The trial court's judgment is affirmed.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
170681F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

VICTOR ALMENDAREZ, Appellant

No. 05-17-00681-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 7, Dallas County, Texas
Trial Court Cause No. F15-76304-Y.
Opinion delivered by Justice Lang, Justices Fillmore and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 19th day of November, 2018.